KIRBY AISNER & CURLEY LLP
*Proposed Attorneys for the Debtors*
700 Post Road, Suite 237
Scarsdale, New York 10583
 (914) 401-9500
Dawn Kirby, Esq.
dkirby@kacllp.com
Erica R. Aisner, Esq.
eaisner@kacllp.com

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

GARUDA HOTELS, INC.,

                      Debtor.

Chapter 11
Case No. 22-30296 (wak)

-----------------------------------------------------------X
In re:

WELCOME MOTELS II, INC.,

                      Debtor.

Chapter 11
Case No. 22-30297 (wak)

-----------------------------------------------------------X

## DECLARATION OF JAY BRAMHANDKAR
## PURSUANT TO LOCAL BANKRUPTCY RULE 1015-2

JAY BRANDHAMKAR, hereby declares under penalties of perjury:

1. I am the 100% shareholder and president of Garuda Hotels, Inc. ("Garuda") and the 66.67% shareholder and president of Welcome Motels II, Inc. ("Welcome", and together with Garuda the "Debtors"). As such, I am fully familiar with the Debtors' assets and liabilities, legal and financial affairs.

2. I submit this declaration pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2015-2 of the Local Rules for the United States Bankruptcy Court for the Northern District of New York.

**BACKGROUND**

3. Garuda is the operator of a Country Inn and Suites Hotel (the "Country Inn") and owns the real property upon which the hotel is located, 110 Danby Road, Ithaca, NY. The primary demand generator for the Country Inn is Ithaca College and secondarily Cornell University. Historically, the Country Inn would generate approximately $2 million in room revenue per year.

4. Welcome is the operator of an Econolodge Hotel (the "Econolodge") and owns the real property upon which the hotel is located, 2303 Triphammer Road, Ithaca, NY. The Econolodge offers a significant community service by providing transitional housing for Tompkins County through a contract with St Johns Community Services. The contract keeps the hotel 60% occupied during the winter and 50% occupied during the summer.

**Local Rule 2015-2 (b)(1) – Circumstances Leading to Bankruptcy**

Effects of COVID-19 on the Debtors' Businesses

5. As with many other businesses in the hospitality industry, the COVID-19 pandemic financially devastated the Debtors.

6. The Debtors' businesses are seasonal. The high season is March through October. The low season is during the winter, November through February.

7. In March 2020, the Debtors had just made it through their low season and were just about to start replenishing their cash flow during their high season.

8. The shutdown of the economy, remote learning Ithaca College and Cornell University, and downturn in the travel industry generally were the cause of the Debtors' financial distress. Leisure travel stopped and business travel diminished to near zero.

9. In April 2020, to preserve liquidity, the Debtors reduced expenses, including

partial staff layoffs, closing the complimentary breakfast, and reductions in supply purchases, credit card processing fees, sales & marketing, franchise fees, property maintenance costs, utilities and administrative expenses, including suspension of management fees paid to the stockholder of the Debtor for managing the hotels.

10. However, it quickly became clear that insufficient revenue was being generated from the combined hotels to pay debt service, escrows and reserves on the Debtors' mortgage loan serviced by Wells Fargo as Master Servicer.

Attempts to Modify the Mortgage

11. The loan was then transferred from Wells Fargo to Rialto Capital Advisors ("Rialto") in its capacity as Special Servicer, which had the authority to make modifications to the loan. On March 30, 2020, the Debtor made a written request for payment deferral of the loan and executed a Pre-Negotiation letter with Rialto to allow negotiations to modify the loan.

12. As the modification discussions moved forward, the Debtors responded to numerous document and information requests from Rialto.

13. The Debtors also retained counsel, Cervini Swanson LLP, to assist in reaching a resolution with Rialto's counsel, Bryan Cave. A full financial audit of the properties was then required by Rialto's counsel. The Debtors complied by providing numerous additional documents and information.

14. The Debtor was also proactive in retaining a broker, as a back-up plan. In September 2020, Marcus and Millichap ("Marcus"), a hotel sales broker, received an offer from a hotel investment group ("Buyer"). After negotiations, the Debtor and Buyer agreed on a sale price of $8,655,000. A contract was executed on March 2, 2021.

15. The sale transaction contemplated the Buyer's assumption of the Rialto loan,

which would avoid a significant $1.1 million prepayment penalty.  In December 2020, Rialto's counsel was provided with the sale information and request for assignment/assumption of the loan.  In response, information about the prospective assignee was requested and further indicated, "*In order to begin the "assumption" request process that you indicated was of interest to Borrowers, the Special Servicer (Rialto Capital Management) will require a signed* **Reservation of Rights letter**.  *Rialto will prepare the letter for your review and your clients' execution but in order to do so, requires you to identify for the letter the name and address of the proposed assignee and the proposed guarantor(s).  Rialto also requires a $5,000 application fee and a $4,500 third party report retainer to be paid when the letter is returned to Rialto.* Although numerous document had already been provided, Rialto's counsel sent a new long list of documents to be provided.

16.     Based on the exchange, the Debtor believed the matter could be resolved.  The disputes concerning the loan would be "cured".  The Debtor would pay all past due loan interest, late fees, special servicing fees, interest on loan advances, a liquidation fee, assumption fee any past due taxes, insurance, legal fees and escrow shortfalls.  In addition, the Buyer would comply with the Rialto Loan Agreement, including reestablishing new Cash Management accounts, depositing funds into a "Seasonality Reserve" account for winter months, entering into a new long-term franchise agreement and depositing funds into a Property Improvement Reserve (PIP) required by the long-term franchise agreement.

17.     Although promised, no reservation of rights letter was ever delivered to the Debtor.

18.     In May 2020, the Debtor's counsel followed up with a detailed, written proposal to Rialto's counsel outlining terms to move forward toward resolution. No response was

received.

19. In June 2020, Debtor's counsel learned that Rialto retained new counsel at Thompson Knight LLP. Debtor's counsel continued to try to reach a resolution, without success. The Buyer extended the sale contract several times through October 2021, and even offered to refinance Rialto through the SBA 7(a) loan program (without prepayment penalty) instead of assuming the Rialto loan. Still, no response was received.

20. The lack of response from Rialto eventually led the Buyer to cancel the sale contract in October 2021.

21. In an effort to preserve the remaining value in the hotel properties, the Debtors are seeking chapter 11 relief. The Debtors' primary goal is to secure replacement financing for the Rialto indebtedness, which will enable the Debtors to satisfy all of their creditors and realize on their numerous years of investment and hard work at the hotel properties. Alternatively, if a refinance cannot be accomplished, the Debtors will consider another sale transaction.

22. The Debtors have been trying to resolve their financial issues outside of Bankruptcy for many months and have unfortunately been forced to seek Bankruptcy Court intervention to ensure that the process is fair and commercially reasonable. Proceeding with the protection of the Bankruptcy Court will help put an end to what the Debtors believe are at best negligent and at worst bad faith tactics, achieving the best outcome for all constituencies.

**Local Rule 2015-2(b)(2) – Summary of Assets and Liabilities**

23. Contemporaneously with the filing of their Petitions, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs.

**Local Rule 2015-2(b)(3) – Property in Possession of Another**

24. None of the Debtors' property is in possession of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor or agent thereof.

**Local Rule 2015-2(b)(3) – Real and Personal Property**

25. Contemporaneously with the filing of their Petitions, the Debtors filed their Schedules A/B and G.

**Local Rule 2015-2(b)(3) – Location of Substantially All Assets**

26. Contemporaneously with the filing of their Petitions, the Debtors filed their Statement of Financial Affairs.

**Local Rule 2015-2(c)(1) – Employee Wages**

27. The estimated amount of payroll for the 30-day period following the Petition Date for Garuda's 16 employees is $20,000 and for Welcome's 11 employees is $19,000.

**Local Rule 2015-2(c)(2) – Officer / Stockholder / Director Wages**

28. The estimated amount of payroll to be paid to any officer, stockholder and director, consisting solely of Mr. Jay Bramhandkar, is $4,000 from Garuda and $4,000 from Welcome. No consultant has been retained.

**Local Rule 2015-2(c)(3) – Projected Income and Expenses**

29. A schedule of estimated cash receipts and disbursements for the 30-day period following the Petition Date is annexed to the Debtor's cash collateral motion, filed simultaneously herewith.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: Ithaca, New York
May 13, 2022

*/s/ Jay Bramhandkar*

Jay Bramhandkar